**Edward STAINTON and Christine Stainton, Plaintiffs,**

v.

**Thomas TARANTINO and Morgan Jones, Defendants.**

**No. 84–5619.**

United States District Court, E.D. Pennsylvania.

June 25, 1986.

John M. Elliott, Baskin, Flaherty, Elliott & Mannino, Philadelphia, Pa., for plaintiffs.

Seymour I. Toll, Philadelphia, Pa., for Thomas Tarantino.

Allen D. Black, Philadelphia, Pa., for Morgan Jones.

## MEMORANDUM, ORDER AND JUDGMENT

KATZ, District Judge.

This case illustrates what happens when ordinary contract and professional malpractice claims are dressed in the costume of RICO. A simple claim that a wealthy investor in real estate tax shelters and his difficult wife were frozen out of future deals by a parvenu becomes an exaggerated struggle between good and evil. A marginal claim that an overly busy lawyer out to get business neglected a matter becomes a vast conspiracy between a lawyer and his client to retire on the money of a rich investor. What is portrayed as the grand opera of racketeering turns into a dreary Chestnut Hill soap opera with thin jury questions.

After a three week trial, the jury bought none of it. There was ample evidence to support the jury's verdict for defendants. Now I am left to decide whether to dissolve some of the partnerships in which the parties were involved. I will not.

In Counts VIII and Count IX of their Second Amended Complaint, plaintiffs ask this Court to dissolve the Epictetus Associates and Highland Partners partnerships. Plaintiffs allege that Tarantino breached fiduciary duties he owed the plaintiffs and breached provisions of the partnership agreements in question. Plaintiffs contend that Tarantino's conduct constitutes circumstances requiring a judicial decree of dissolution of the two partnerships pursuant to 59 Pa.Cons.Stat.Ann. § 354(a)(4) and § 354(a)(6) (Purdon 1985).

Plaintiffs also ask this Court to rescind an amendment to the Epictetus Associates General Partnership Agreement, to dissolve Epictetus Associates and Highland Partners, order an accounting of these partnerships and appoint a receiver for the purposes of winding up the affairs of these partnerships.

In their Proposed Findings of Fact and Conclusions of Law, plaintiffs, for the first time, ask this Court to dissolve the Epictetus I and Blair Hall partnerships, order an accounting of these partnerships and appoint a receiver for the purposes of winding up partnership affairs. Plaintiffs base their demand for dissolution on alleged breaches of fiduciary duty, fraud, and violations of Pennsylvania partnership law.

Defendant Tarantino, in his Proposed Findings of Fact and Conclusions of Law, for the first time, asks this Court to dissolve Epictetus Associates. Tarantino contends that Mr. Stainton wrongfully dissolved the partnership by his express will to end his business relationship with Tarantino. See 59 Pa.Cons.Stat.Ann. § 353(2). Tarantino requests that he be allowed to buy out Mr. Stainton's interest in Epictetus Associates and continue to run the partnership, pursuant to 59 Pa.Cons.Stat.Ann. § 360(b)(2).

For the reasons set forth below, judgment will be entered against plaintiffs and for defendants on Counts VIII and Count IX of plaintiffs' Second Amended Complaint. All other relief is denied.

The following are my Findings of Fact and Conclusions of Law with respect to Count VIII and Count IX of plaintiffs' Second Amended Complaint.

### FINDINGS OF FACT

1. Plaintiff Edward Stainton (hereafter "Mr. Stainton") is a very wealthy investor of an inherited fortune and chairman of the Creative Arts Department at a private school in Philadelphia. N.T. 5–19 to 5–20; 5–153 to 5–154; 5–159 to 5–167; 6–27 to 6–34.

2. Plaintiff Christine Stainton (hereafter "Mrs. Stainton"), Mr. Stainton's wife, is active in volunteer groups. N.T. 5–56.

3. Defendant Thomas Tarantino (hereafter "Tarantino") is a real estate promoter

and also educated as a certified public accountant and an attorney. N.T. 1–88; 5–159 to 5–160.

4. Defendant Morgan Jones (hereafter "Jones") is a partner in a large Philadelphia law firm. N.T. 6–105; 6–148; 14–81 to 14–83.

5. The original Complaint in this matter was filed on November 15, 1984 and demands a jury trial. The First Amended Complaint was filed on April 12, 1985 and demands a jury trial. The Second Amended Complaint was filed on October 1, 1985 and demands a jury trial.

6. The Second Amended Complaint includes in Counts VIII and IX a demand for dissolution of two of the partnerships in which the parties were involved, Epictetus Associates and Highland Partners. Plaintiffs also demand that the Court rescind an Amendment to the Epictetus Associates General Partnership Agreement on the grounds that it was obtained by fraud. Dissolution is demanded pursuant to 59 Pa.Cons.Stat.Ann. § 354(a)(4) and § 354(a)(6) (Purdon 1985).

7. Plaintiffs' demands for dissolution of Epictetus Associates and Highland Partners are premised on allegations that Tarantino breached fiduciary duties to plaintiffs and that such breaches constituted violations of the partnership agreements as well as violations of Pennsylvania law. Plaintiffs also contend that defendants violated various provisions of the Racketeer Influenced and Corrupt Organizations Act (hereafter "RICO") (18 U.S.C.A. § 1961 *et seq.*) (West 1984) and committed professional malpractice.

8. In their Proposed Findings of Fact and Conclusions of Law, plaintiffs ask this Court to dissolve the Epictetus I and Blair Hall, Ltd. partnerships. Plaintiffs allege that Tarantino misappropriated partnership funds and fraudulently reduced Mr. Stainton's interest in the Blair Hall partnership.

9. Plaintiff also allege that Tarantino has failed to provide the Staintons with any financial information regarding the partnerships since October, 1984.

10. In addition plaintiffs request a judicial decree of dissolution on the grounds that Tarantino's conduct has prejudicially affected the carrying on of the partnership business and because the differences between the parties are unreconciliable. 59 Pa.Cons.Stat.Ann. § 354(a)(3).

11. Plaintiffs did not request dissolution of the Blair Hall or Epictetus I partnerships in their Second Amended Complaint.

12. None of the partnerships involved are named as parties to this lawsuit.

13. Defendant Tarantino first met the Staintons in 1978 while he was employed as a certified public accountant by a large accounting firm in Philadelphia. N.T. 3–13, 5–18.

14. While employed by the accounting firm, Tarantino prepared the plaintiffs' tax returns (N.T. 1–99 to 1–101; 3–11); Mrs. Stainton's will (N.T. 1–96); codicils for Mr. Stainton's will (N.T. 1–96); trust agreements for their daughter (N.T. 1–96; 1–127, 5–158 to 5–159); and the partnership agreements for Epictetus Associates and Highland Partners (N.T. 1–104; 1–121; 2–66; 5–167). Tarantino also reviewed an offering memorandum on Mr. Stainton's behalf. N.T. 1–109 to 1–111; 5–159 to 5–160.

15. Tarantino denied that he was the Staintons' attorney. *See e.g.*, N.T. 1–92; 1–109; 2–12; 2–16. Tarantino claimed he acted as the Staintons' business partner in the real estate transactions at issue and that he performed legal and accounting services for the partnerships in question as part of his duties as general and managing partner. N.T. 1–94; 1–100; 1–109; 2–12; 2–16; 2–19; 2–26; 2–51 to 2–52.

16. Tarantino also discussed investment and other financial matters with Mr. Stainton (N.T. 1–89 to 1–90; 1–98 to 1–99) in addition to other financial services he performed for the Staintons. N.T. 3–9 to 3–12; 5–158 to 5–167.

17. Some time after meeting the Staintons, Tarantino recommended that plaintiffs invest in real estate as a tax shelter for their unearned income. N.T. 5–23. De-

fendant Tarantino advised plaintiffs to purchase an apartment building in Philadelphia called Highland Court. N.T. 5–62; 5–163 to 5–167.

18. Tarantino created a two-tiered partnership structure to purchase Highland Court. N.T. 2–26 to 2–32.

19. Tarantino and *Mrs.* Stainton formed a general partnership called Epictetus Associates. Epictetus Associates then became one of the limited partners in an existing limited partnership, Highland Partners, which owned Highland Court at the time of purchase. N.T. 2–62 to 2–68.

20. One of the limited partners in Highland Partners continued in the partnership after the sale of the building in order to keep the partnership from dissolving and thus avoid the imposition of realty transfer taxes. N.T. 2–62 to 2–63.

21. This "carryover" limited partner is not named as a party to this suit.

22. Plaintiffs contended at trial that the two-tiered partnership structure was a device Tarantino used to exclude Mr. and Mrs. Stainton from participating in the partnership business and to gain control of Highland Court while misrepresenting to the Staintons that they would be owners of Highland Court. *See* N.T. 2–27 to 2–28; 2–36.

23. However, I credit Tarantino's testimony in this matter. Tarantino testified that the two-tier partnership structure was designed to protect the Staintons' assets from potential liability and to give Tarantino, as general partner of Epictetus Associates and Highland Partners, the authority to conduct the partnership business. Mr. Stainton had advised Tarantino that he wanted to minimize his tax liability and also protect the Staintons' assets from potential liability. The Staintons also wanted their interest in the partnerships kept from public knowledge. N.T. 2–28 to 2–30; 2–43; 2–64; 5–70; 5–96; 5–99 to 5–100; 6–64 to 6–65.

24. The lack of any sinister motive on Tarantino's part for devising the two-tier partnership structure is also demonstrated by the fact that Tarantino gave Mr. Stainton a general power of attorney to act in the former's stead as the general partner of both Highland Partners and Epictetus Associates. N.T. 2–29 to 2–30; 2–64 to 2–65; 2–68; 5–175.

25. Tarantino gave Mr. Stainton the power of attorney in order to give Mr. Stainton ultimate control of the enterprise in case something happened to Tarantino. N.T. 2–68; 2–84; 5–175.

26. Tarantino also explained why *Mrs.* Stainton was a general partner in Epictetus Associates instead of *Mr.* Stainton, who was putting up the money. Mr. Stainton wanted to get Mrs. Stainton interested and involved in business matters so that in the event of his death, she would be sufficiently knowledgeable to handle the Staintons' financial affairs. N.T. 2–42 to 2–43; 5–41 to 5–42; 5–174.

27. Mrs. Stainton's presence as general partner in Epictetus Associates was also an estate planning device. N.T. 2–43; 5–174.

28. Epictetus Associates is a Pennsylvania general partnership. Stipulation of Facts, paragraph 1 (Ex. J–83).

29. Under the terms of the general partnership agreement for Epictetus Associates (dated June 3, 1980), Tarantino is to make management decisions, subject to Mrs. Stainton's approval (P–306, at section 3.1) and has a fiduciary duty to Mrs. Stainton to act in good faith in the performance of all partnership duties. *Id.* at section 3.2.

30. Mrs. Stainton has a 99% share of all profits and losses; Tarantino's share is 1%. *Id.* at section 4.1. The agreement is silent with respect to the distribution of management fees.

31. The partners may amend the agreement at any time. *Id.* at section 7.2. The agreement is to be governed by Pennsylvania law. *Id.* at section 7.1.

32. Mrs. Staintons' initial capital contribution to Epictetus Associates was $9,900.00; Tarantino contributed $100.00. *Id.* at section 2.1.

33. Highland Partners is a Pennsylvania limited partnership. Stipulation of Facts, paragraph 3. The term of the partnership runs from September 1, 1978 to October 1, 1998. Amendment to Agreement of Limited Partnership of Highland Partners, section 6.1 (Ex. P–9). Tarantino is the general partner of the partnership. *Id.* at section 6.1. Tarantino is to manage the partnership and has a fiduciary duty to the limited partners to act at all times in good faith in the performance of his partnership duties. *Id.* at sections 8.1, 8.2.

34. The limited partners in Highland Partners are Epictetus Associates and the "carryover" limited partner. *Id.* at Schedule A. Neither limited partner is a party to this lawsuit. Neither Mr. Stainton nor Mrs. Stainton is a partner in Highland Partners.

35. Epictetus Associates has a 98% share of profits and losses; Tarantino has a 1% share, as does the carryover limited partner. *Id.* at section 9.1, Schedule A. Epictetus Associates holds an option to buy out the interest of the carryover limited partner for $100. N.T. 2–66; 2–82.

36. The limited partners are protected from liability for partnership debts. *Id.* at section 11.2.

37. The purpose of Highland Partners is to "invest in, acquire, hold, maintain, operate, improve, develop, sell, exchange, lease and otherwise use real property ... for profit...." *Id.* at section 3.1.

38. The partnership agreement contains no provisions for removing a limited partner. No limited partner may "withdraw from the partnership without the prior written consent of the General Partner." *Id.* at section 12.1.

39. The Highland Partners partnership agreement is silent with respect to the distribution of management fees.

40. Tarantino prepared the partnership agreements and other legal documents in connection with the purchase of Highland Court. N.T. 1–104; 1–121; 2–66; 5–167. Tarantino never advised the Staintons to obtain independent legal counsel or ac-counting advice in connection with the transaction. N.T. 2–60 to 2–61; 5–170 to 5–171.

41. To finance the purchase of Highland Court, Mr. Stainton borrowed $300,-000.00, secured upon a pledge of some of his stock. Eventually, the Staintons' investment in Highland Court totalled $360,-000.00. N.T. 2–5; 2–64; 6–57 to 6–60.

42. The tax savings from deducting the interest on the borrowed money, along with Mrs. Stainton's share of the partnership's net losses, equalled the interest Mr. Stainton was obliged to pay on the loan. The result was that the after-tax cost to the Staintons of borrowing the money was zero. N.T. 5–25 to 5–26; 13–29 to 13–30.

43. The Staintons asked that Tarantino hold himself out as the owner of Highland Court because they did not want others to know of their ownership interest in the apartment complex. N.T. 2–183 to 2–184; 5–96 to 5–99; 6–59 to 6–60.

44. Because the pledged stock belonging to Mr. Stainton was at risk as long as the loan in question was outstanding, Tarantino and Mr. Stainton orally agreed at the time of the purchase of Highland Court that Tarantino would attempt to refinance Highland Court as soon as feasible so Mr. Stainton would receive the return of this capital investment as soon as possible. N.T. 2–110 to 2–111; 3–160 to 3–162.

45. At the same time, Tarantino and Mr. Stainton orally agreed that once Mr. Stainton received back the proceeds of the loan from the projected refinancing, Tarantino and the Staintons would share equally in the allocation of profits, losses and distributions from Epictetus Associates. N.T. 3–179; 4–9; 4–13 to 4–15; 4–121 to 4–124; 12–130 to 12–132.

46. The parties planned to refinance and to reallocate the partnership interests after the Staintons had received certain tax benefits from the transaction. N.T. 2–24 to 2–25; 5–45.

47. The record reflects that the parties discussed the Highland Court transaction extensively and that the Staintons were

well aware of Tarantino's interest in the acquisition of Highland Court and consented to his participation in the transaction. N.T. 2–79; 2–90 to 2–91; 2–119 to 2–122; 6–62 to 6–63.

48. I find that the transaction was not unfair to the Staintons either on its face or in substance.

49. The parties did not intend that Mrs. Stainton, the named general partner in Epictetus Associates, be a straw party to the transaction involving the purchase of Highland Court, but she soon became one. She showed little interest in partnership business. N.T. 2–54 to 2–56; 2–68 to 2–69; 2–76 to 2–79; 2–110 to 2–114; 2–119 to 2–120; 3–167 to 3–168; 5–87 to 5–90; 5–112 to 5–115.

50. Plaintiffs contend that Tarantino misappropriated partnership funds by moving into a rent-free apartment and renovating and furnishing that apartment with partnership funds. *See* N.T. 2–162 to 2–164. Plaintiffs also contend that Tarantino repaired his personal automobile with partnership funds and purchased a piano. *See* N.T. 2–157 to 2–158.

51. I find that Tarantino disclosed all these alleged misappropriations to the Staintons and that they consented to them. N.T. 2–157 to 2–160; 2–162 to 2–164; 5–176 to 5–177. The rent-free apartment was part of his compensation for managing the partnerships. N.T. 4–166 to 4–167; 5–62; 5–80; 5–167; 5–176 to 5–177; 12–114 to 12–115. Such compensation was reasonable under the circumstances. N.T. 13–178 to 13–179; 14–6 to 14–7.

52. In or about 1982, Tarantino and Mr. Stainton acquired another apartment building in Philadelphia, Colonial Manor. N.T. 1–90 to 1–91.

53. Colonial Manor was Tarantino's first real estate syndication. N.T. 3–25. Mr. Stainton advanced the deposit of $32,-325.00 for the purchase of Colonial Manor. This sum was returned to him as other investors in the transaction made their capital contributions. N.T. 2–9 to 2–10; 2–167 to 2–168. Mr. Stainton also guaranteed

that he would purchase any unsold limited partnership units; however, all these interests were sold. N.T. 2–167 to 2–168; 5–180.

54. In acquiring Colonial Manor, Tarantino once again used a two-tier partnership structure. Tarantino and Mr. Stainton formed a limited partnership called Epictetus I. Tarantino is the general partner of this partnership, and Mr. Stainton is the sole limited partner. All income, gains and losses are to be allocated in equal amounts to Tarantino and Mr. Stainton. Epictetus I Limited Partnership Agreement, section 6.01 (P–314). The agreement is silent with respect to the disposition of management fees. *See* N.T. 3–17 to 3–18; 4–15 to 4–16.

55. Tarantino then formed another limited partnership, Star Enterprises Ltd., which holds the title to Colonial Manor. Epictetus I is the sole general partner of Star Enterprises. Tarantino, as general partner of Epictetus I, managed both partnerships and managed the apartment building. N.T. 2–9; 2–165 to 2–167; 2–178 to 2–182.

56. Tarantino drafted the partnership agreement for Epictetus I. N.T. 2–19; 2–179.

57. But he retained Jones' law firm to do other legal work in connection with the purchase of Colonial Manor. N.T. 2–19; 3–25 to 3–26; 3–29; 7–43 to 7–44.

58. Tarantino never advised Mr. Stainton to obtain independent legal counsel or accounting advice in connection with the purchase of Colonial Manor. N.T. 2–13 to 2–14; 2–179; 3–27 to 3–28. Tarantino denied that he provided legal or accounting services to Mr. Stainton with respect to this transaction. Rather, Tarantino claimed he was Mr. Stainton's partner in the transaction. N.T. 2–19 to 2–20; 2–22 to 2–23; 2–176.

59. I find that Tarantino and Mr. Stainton were in a business relationship with respect to the acquisition of Colonial Manor. Although neither Tarantino nor Jones ever advised Mr. Stainton to obtain independent counsel or accounting advice, Mr.

Stainton, a sophisticated investor, had every opportunity to do so.

60. Tarantino took virtually all of the management fees generated by the operation of Colonial Manor. N.T. 2–180 to 2–182; 2–190 to 2–191; 3–17 to 3–18. I find that Tarantino and Mr. Stainton orally agreed that Tarantino would receive fees for managing the apartment building and for syndicating this real estate transaction. N.T. 2–191; 3–17 to 3–18; 4–15 to 4–16; 12–41 to 12–44; 12–115 to 12–116. The fees he received were ordinary and reasonable under the circumstances. N.T. 13–174 to 13–176; 14–13.

61. In late 1983, Tarantino syndicated the purchase of another apartment building in Philadelphia, now called Chestnut Hill Apartment. N.T. 1–91; 3–53; 5–17.

62. Mr. Stainton advanced the deposit under the agreement of sale and was reimbursed for this advance. N.T. 3–54; 3–58; 5–17; 6–3.

63. Tarantino used a two-tier partnership structure to purchase Chestnut Hill Apartments. Tarantino formed a limited partnership, Blair Hall, Ltd. Under the terms of the Blair Hall Limited Partnership agreement Tarantino is the general partner, and Mr. Stainton is one of several limited partners. N.T. 3–47 to 3–49. Ex. P–315, Section 6.02. Mr. Stainton is entitled to receive 12.5% of partnership income and losses. Ex. P–315, Section 6.02.

64. Tarantino then formed another limited partnership, Star Enterprises II, which holds the title to Chestnut Hill Apartments. Blair Hall is the general partner of Star Enterprises II. N.T. 3–47 to 3–48; 3–64.

65. Tarantino retained Jones' law firm to do the legal work for the acquisition of Chestnut Hill Apartments. N.T. 3–65; 4–4 to 4–5; 6–7 to 6–8; 7–77 to 7–79.

66. Tarantino did not advise the Staintons to get independent legal counsel or accounting advice in connection with the acquisition of Chestnut Hill Apartments. N.T. 3–62 to 3–63; 3–71. Jones did not advise Tarantino or Mr. Stainton that the latter should obtain independent legal counsel for this transaction. N.T. 7–80.

67. A draft of the Blair Hall partnership agreement shows that Mr. Stainton is the sole limited partner and is to receive 50% of the income of that partnership. N.T. 2–49 to 2–50; 3–64 to 3–65. Exs. P–259; P–272.

68. Mr. Stainton was aware that other parties were to be limited partners in Blair Hall. N.T. 3–68 to 3–70; 3–76; 6–4.

69. Tarantino and Mr. Stainton wanted to make a charitable contribution to the Chestnut Hill community. In order to provide for this bequest, Tarantino agreed to give up $100,000.00 worth of management fees, and Mr. Stainton agreed to the reduction of his interest in Blair Hall. N.T. 3–65 to 3–70; 3–72 to 3–76; 12–97 to 12–99; 12–119; 12–146 to 12–147; 13–26 to 13–28.

70. I find that Tarantino did not misappropriate any partnership funds. The bonuses Tarantino distributed in connection with refinancing Colonial Manor and Chestnut Hill Apartments were reasonable under the circumstances. N.T. 5–10 to 5–18; 5–45 to 5–48; 12–123 to 12–126. Any management or promotional fees Tarantino received from syndicating and managing Colonial Manor and Chestnut Hill Apartments were ordinary and reasonable under the circumstances. N.T. 13–174 to 13–176. Mr. Stainton was aware that Tarantino was to receive such fees for these services. N.T. 12–41 to 12–45.

71. In the first half of 1984, three events occurred: Mrs. Stainton assigned her interest in Epictetus Associates to Mr. Stainton, Tarantino arranged for the refinancing of Highland Court, and Mr. Stainton and Tarantino executed an amendment to the general partnership agreement for Epictetus Associates. These three events are related.

72. Plaintiffs contend that Tarantino induced Mrs. Stainton, through misrepresentations, to assign her interest in Epictetus Associates to Mr. Stainton to enable Tarantino to gain absolute managerial control of Epictetus Associates and Highland Part-

ners. Plaintiffs also contend that the purpose of the assignment was to enable Tarantino to induce Mr. Stainton, by the former's misrepresentations, to execute the amendment to the Epictetus Associates General Partnership Agreement, which increased Tarantino's interest in that partnership. Second Amended Complaint, paragraph 70.

73. I credit Tarantino's version of these events.

74. By early 1984, the relationship between Tarantino and Mrs. Stainton had deteriorated. N.T. 3–166 to 3–169. Tarantino discussed this matter with Mr. Stainton. N.T. 3–167 to 3–171; 6–9. Tarantino then asked Mr. Stainton to have Mrs. Stainton assign her interest in Epictetus Associates to her husband. Mrs. Stainton had shown little interest in the conduct of partnership business. N.T. 3–167 to 3–172; 3–176; 5–89 to 5–90; 6–9.

75. With the personal animosity between Tarantino and Mrs. Stainton, Tarantino and Mr. Stainton believed the assignment was necessary to enable the partnership to conduct its business. N.T. 3–171.

76. Tarantino had another concern as well. He and Mr. Stainton had orally agreed to amend the Epictetus Associates General Partnership Agreement once Mr. Stainton received a distribution from the refinancing of Highland Court. The proceeds of the new mortgage loan would reimburse Mr. Stainton for the loan that he had previously taken out to finance the purchase of Highland Court. N.T. 3–91 to 3–92; 3–171 to 3–172; 3–176; 4–57 to 4–58.

77. The contemplated amendment to the partnership agreement would provide for an equal split of profits and losses. Tarantino testified that he was not going to have time to prepare the amendment prior to the refinancing. While he trusted Mr. Stainton to execute the amendment after the latter had received the distribution from the refinancing, he did not trust Mrs. Stainton to do so. For this reason, Tarantino wanted Mr. Stainton to have Mrs. Stainton assign her interest in Epictetus Associates to her husband. Without the assignment, Taran-

tino did not feel comfortable distributing the proceeds of the new mortgage loan to Mr. Stainton. N.T. 3–171 to 3–172; 4–57 to 4–58.

78. The refinancing yielded $315,000.00 in cash. Tarantino distributed $290,000.00 of that amount to Mr. Stainton, and some of the balance was used for improvements on an apartment occupied at below-market rent by Mr. Stainton's sister-in-law. N.T. 2–109; 4–113 to 4–118; 6–68 to 6–69.

79. As part of the refinancing of Highland Court, Tarantino assumed personal liability for the new mortgage debt of $515,000.00. Mr. Stainton did not want to be personally liable on this new mortgage. Tarantino also waived approximately $35,000.00 in distributions and fees to which he was entitled. N.T. 3–90 to 3–91; 4–57 to 4–58; 4–113 to 4–120; 12–127.

80. Some time after the refinancing, Tarantino drafted an amendment to the Epictetus Associates General Partnership Agreement. That amendment reflected the oral understanding between Mr. Stainton and Tarantino that these parties would share equally in partnership profits, losses and distributions once Mr. Stainton had received enough money, from the refinancing, to pay off the $300,000.00 loan. N.T. 3–90 to 3–92; 4–26 to 4–27; 4–57 to 4–59.

81. Tarantino brought a handwritten draft of this amendment to Jones, and asked Jones to review it. N.T. 4–35 to 4–36; 7–28.

82. After reviewing the proposed amendment and the original agreement, Jones suggested the addition of some recitals at the beginning of the document to clarify the history of the amendment. N.T. 4–27 to 4–37; 4–47 to 4–51; 4–56; 7–23 to 7–24; 7–120 to 7–121; 7–125; 7–127 to 7–128. Jones made no substantive changes to the proposed amendment. N.T. 4–56; 12–158; 14–125.

83. In particular, Jones noted that the original agreement was between Tarantino and Mrs. Stainton while the proposed amendment was between Tarantino and Mr. Stainton. Jones suggested adding a

paragraph stating that Mrs. Stainton had assigned her interest to Mr. Stainton so that persons examining the original and amended agreements would understand why the parties to the agreement had changed. N.T. 4–36; 7–121; 7–127 to 7–128.

84. In addition, Jones suggested a recital of the reason for the amendment. N.T. 4–47; 4–51 to 4–52; 7–94; 7–128 to 7–129. That clause of the amended agreement reads as follows:

> WHEREAS, THT [Tarantino] and ECS [Mr. Stainton] were in agreement that were the mortgage debt on Highland Court refinanced with the result that a substantial cash distribution could be made by HIGHLAND PARTNERS to its limited partner, EPICTETUS, and by EPICTETUS to its general partners, the allocation of profits, losses and cash flow of EPICTETUS would be revised to provide equality of allocation between the general partners....

Ex. P–307.

This recital comports with Tarantino's version of the events surrounding the amendment. *See* N.T. 3–179; 4–9; 4–13 to 4–15; 4–121 to 4–124; 12–130 to 12–132.

85. With Jones' recommendations in mind, Tarantino retyped the amendment and gave it to Mr. Stainton, who took it home with him. N.T. 4–57 to 4–58.

86. Mr. Stainton testified that he never read the amendment and that Tarantino never explained the impact of the amendment to him. N.T. 6–12 to 6–13; 6–22 to 6–23; 12–48. Tarantino never advised Mr. Stainton to obtain independent legal counsel to review the amendment. N.T. 4–19 to 4–20; 4–121 to 4–122. Jones never advised Mr. Stainton or Tarantino that Mr. Stainton should obtain independent legal counsel to review the amendment. N.T. 7–95 to 7–96.

87. I credit Tarantino on this matter. He testified that he and Mr. Stainton had discussed the nature and effect of the proposed amendment on previous occasions. N.T. 4–46; 4–52 to 4–53; 4–123 to 4–124. When he offered to review the document with Mr. Stainton, Mr. Stainton did not allow him to do so; Mr. Stainton said he needed no explanation because he trusted Tarantino. N.T. 4–57 to 4–62; 6–12 to 6–13; 12–48.

88. Mr. Stainton returned the amended agreement a few days later signed, witnessed and acknowledged. N.T. 4–66 to 4–67; 6–14 to 6–15.

89. Tarantino testified that Mr. Stainton, by signing the amendment, proved he was an honorable man. He noted that the refinancing distribution of cash to Mr. Stainton preceded the amendment to the Epictetus Associates partnership agreement by some months time. If Mr. Stainton had refused to sign the amendment, Tarantino would have had no way to prove the existence of their prior oral agreement concerning the re-allocation of partnership interests. N.T. 3–91 to 3–92; 4–18 to 4–19.

90. The present partners in Epictetus Associates are Thomas Tarantino and Edward Stainton. Stipulation of Facts, paragraph 2.

91. The recitals of Amendment No. 1 to General Partnership Agreement of Epictetus Associates state that Mrs. Stainton and Tarantino formed the partnership to make indirect investments in real estate and that Epictetus Associates became a limited partner in Highland Partners, the owner of Highland Court. Ex. P–307.

92. The assignment of Mrs. Stainton's interest in Epictetus Associates to Mr. Stainton is also noted in the recitals. *Id.*

93. The purpose of the amendment is laid out in the recitals as well. The amendment notes an agreement between Tarantino and Mr. Stainton to re-allocate the distribution of profits, losses and cash flow of Epictetus Associates if the mortgage debt on Highland Court was refinanced and Highland Partners made a substantial cash distribution to Epictetus Associates and then to the general partners of Epictetus Associates. The amendment states that the allocation of income would be revised to provide "equality of allocation between the general partners." *Id.*

94. The amendment states that the refinancing occurred on February 27, 1984, that the cash distribution was made and that Tarantino assumed personal liability for the new mortgage debt. *Id.*

95. The amendment reflects the intention of the parties "to formalize the above-described equal allocation agreement...." *Id.* The amendment is effective as of January 1, 1984. *Id.*

96. The partnership term is to expire no later than December 31, 2020, unless dissolution is mutually agreed upon. *Id.* at section 1.3.

97. Tarantino is to manage the partnership activities and has a fiduciary duty to Mr. Stainton to act in good faith in the performance of all partnership duties. *Id.* at sections 3.1 and 3.2.

98. The purpose and business of the partnership is to make indirect investments in real estate. *Id.* at section 1.4.

99. All net losses and profits are to be divided equally between Tarantino and Mr. Stainton. *Id.* at section 4.1.

100. The amendment contains no provision for the removal of a partner. The amendment does state that "[n]o partner may voluntarily withdraw from the partnership without the prior consent of the other partner, which consent shall not be unreasonably withheld." *Id.* at section 6.1.

101. The amendment states that Tarantino consented to the assignment of Mrs. Stainton's interest in the partnership to her husband. *Id.* at Section 5.1.

102. The amendment is silent with respect to the distribution of management fees.

103. The amendment is to be governed by Pennsylvania law. *Id.* at section 7.1.

104. At about the time of the refinancing, Tarantino became concerned that the management of the partnership remain stable in the event he became incapacitated or in the event of his death. N.T. 2–140; 2–149; 7–111 to 7–111A.

105. After the refinancing, Mr. Stainton and Tarantino orally agreed to revoke Mr. Stainton's power of attorney with respect to Highland Court. The parties agreed that since Mr. Stainton had received back his capital investment in the property through the refinancing, he no longer needed the power of attorney as a check on Tarantino's authority. N.T. 2–140; 2–147 to 2–151; 2–157; 3–163 to 3–164; 4–55.

106. Tarantino contemplated the creation of a grantor trust, the trustees of which would manage the properties if he were unable to act and thus provide continuity of management. N.T. 2–149 to 2–150; 4–37 to 4–38; 7–111 to 7–112; 12–162 to 12–163; 14–92 to 14–94.

107. As an interim measure, Tarantino asked Jones to accept a revocable power of attorney so that someone would be available to manage the partnership in case Tarantino was incapacitated. N.T. 2–140; 2–146 to 2–151; 7–112 to 7–113; 12–162 to 12–163.

108. Jones accepted the power of attorney but never exercised it. N.T. 2–149; 7–112 to 7–113; 14–92 to 14–96.

109. In early 1984, Tarantino and Mr. Stainton began to explore the possibility of acquiring a fourth property in Chestnut Hill, the Cherokee Apartments. N.T. 4–68 to 4–69; 6–8 to 6–9.

110. Tarantino retained Jones and his law firm to help negotiate the purchase of the Cherokee and prepare legal documents in connection with the purchase. N.T. 4–82; 4–85; 8–13 to 8–15; 12–150.

111. In early 1984, Tarantino and Mr. Stainton also discussed the latter's participation as a partner in the acquisition of the Cherokee. N.T. 1–90; 4–68; 6–17 to 6–18.

112. In the summer of 1984, Tarantino instructed attorneys at Jones' law firm to prepare partnership and syndication documents in anticipation of consummating the purchase of the Cherokee. In early drafts, Mr. Stainton is listed as a limited partner in the Lone Ranger, the limited partnership which is the general partner in the partnerships which now own the Cherokee Apartments. N.T. 2–50; 4–102 to 4–

105; 8–39 to 8–46; 8–51 to 8–52; 14–133 to 14–135.

113. Tarantino instructed Jones to delete Mr. Stainton's name from the draft documents in or about July, 1984. N.T. 4–143 to 4–148; 8–51 to 8–53; 12–152 to 12–155; 14–133 to 14–135. It was at about this time that Mr. Stainton informed Tarantino he wanted to end their business relationship. N.T. 4–143 to 4–148; 5–27 to 5–28; 6–19; 6–45; 6–49; 6–74 to 6–81; 8–46; 12–135 to 12–136.

114. An agreement of sale for Cherokee was signed in or about August, 1984. N.T. 14–130. In February, 1985, the Cherokee transaction closed. N.T. 4–138; 14–130 to 14–131.

115. Mr. Stainton contended at trial that Tarantino breached an oral contract with him concerning the Cherokee transaction. Mr. Stainton claimed that Tarantino promised to make him his equal partner in all his real estate transactions after the purchase of Highland Court. N.T. 5–178. *See also* N.T. 2–11; 4–18; 4–70.

116. Tarantino denied the existence of any oral contract with respect to Cherokee. N.T. 4–70; 4–90; 4–101; 12–152. I believe him.

117. In August and September, 1984, the parties conducted negotiations for Tarantino's purchase of Mr. Stainton's interest in Highland Court. N.T. 5–27 to 5–28; 5–30 to 5–31; 6–19; 6–45 to 6–50; 6–74 to 6–78; 6–80 to 6–84. There were also negotiations concerning Mr. Stainton's interest in Blair Hall and Epictetus I. N.T. 6–80 to 6–81. Ex. T–22.

118. A real estate appraiser retained by Mr. Stainton informed Mr. Stainton that Tarantino's offer for his interest in Highland Court was fair but low. N.T. 6–46 to 6–47. *See also* N.T. 5–33.

119. Negotiations continued into November, 1984. N.T. 5–30 to 5–33. The parties never reached agreement on a price for Mr. Stainton's interests in any of the partnerships at issue.

120. This lawsuit commenced on November 15, 1984.

121. In their post-trial papers, plaintiffs contend that since October, 1984, Tarantino has failed and refused to provide Mr. Stainton, voluntarily, with any financial information regarding the partnerships.

122. I credit Tarantino on this matter. Tarantino testified that he sent monthly financial reports to Mr. Stainton on Highland Court until the refinancing in February, 1984. At that time, Mr. Stainton told Tarantino that he no longer needed such statements as he had received his initial capital investment back from the proceeds of the refinancing. N.T. 5–16 to 5–17.

123. Prior to this litigation, Mr. Stainton never pressed Tarantino for financial information with respect to Colonial Manor or Chestnut Hill Apartments as he had no capital invested in these buildings. N.T. 5–17. Tarantino sent Mr. Stainton information regarding bonuses Tarantino distributed in connection with the refinancing of Colonial Manor and Chestnut Hill Apartments. N.T. 5–17 to 5–18.

124. In addition, Tarantino provided Mr. Stainton with information that allowed Mr. Stainton to take advantage of certain income tax benefits for the 1984 and 1985 tax years. N.T. 12–104 to 12–108; Ex. T–20; T–29; T–41.

125. Trial in this case commenced on January 6, 1986.

126. On January 30, 1986, the jury returned a verdict for the defendants on special interrogatories. The jury answered "No" to the following question of the Court: "Can plaintiffs recover from either or both of the defendants on any theory explained in this Court's charge?" Verdict at 3.

127. All parties agreed to the entry of judgment in favor of the defendants and against the plaintiffs after the verdict. *Id.*

## DISCUSSION, FINDINGS AND CONCLUSIONS

1. Count VIII and IX of plaintiffs' Second Amended Complaint ask for equitable relief with respect to Epictetus Associates

and Highland Partners. In their Proposed Findings of Fact and Conclusions of Law, plaintiffs also ask this Court for equitable relief with respect to the Blair Hall, Ltd. and Epictetus I partnerships.

2. Despite plaintiffs' failure to demand relief with respect to Blair Hall and Epictetus I in their complaint, this Court may grant such relief if appropriate. Rule 54(c) of the Federal Rules of Civil Procedure provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Fed.R.Civ.P. 54(c). *See Glick v. Campagna,* 613 F.2d 31, 37 n. 5 (3d Cir.1980); *Francois v. Francois,* 599 F.2d 1286, 1293–95 (3d Cir.1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 679, 62 L.Ed.2d 653 (1980); *Walton v. Eaton Corp.,* 563 F.2d 66, 77 n. 7 (3d Cir.1977); 6 *Moore's Federal Practice* ¶ 54.62 (1985); C. Wright & Miller, *Federal Practice and Procedure* § 1255 (1969).

3. Courts sitting in equity may fashion remedies suitable to the circumstances of cases so as to safeguard, conveniently to adjudge and promptly to enforce substantial rights of all the parties before them. *Alexander v. Hillman,* 296 U.S. 222, 239, 56 S.Ct. 204, 209, 80 L.Ed. 192 (1935).

4. Dissolution of the general and limited partnerships in question is governed by the Pennsylvania Uniform Partnership Act. 59 Pa.Cons.Stat.Ann. § 301 *et seq.* (Purdon 1985) (in particular, see § 311; §§ 351–365). Dissolution is defined in the statute as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business." *Id.* at § 351. On dissolution, "the partnership is not terminated, but continues until the winding up of partnership affairs is completed." *Id.* at § 352.

5. Under the statute, certain acts cause the dissolution of a partnership. Dissolution is caused:

"(1) Without violation of the agreement between the partners:

(i) By the termination of the definite term or particular undertaking specified in the agreement.

(ii) By the express will of any partner when no definite term or particular undertaking is specified.

(iii) By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking or after the termination of any specified term or particular undertaking.

(iv) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners.

(2) In contravention of the agreement between the parties, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time.

(3) By any event which makes it unlawful for the business of the partnership to be carried on, or for the members to carry it on in partnership.

(4) By the death of any partner.

(5) By the bankruptcy of any partner or partnership.

(6) By decree of court under section 354 (relating to dissolution by decree of court)."

*Id.* at § 353.

6. Plaintiffs have requested this court to dissolve the partnerships in question, pursuant to sections 354(a)(3), 354(a)(4) and 354(a)(6). Those provisions provide that a court,

"[o]n application by or for a partner, ... shall decree a dissolution whenever:

· · · · ·

(3) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business.

(4) A partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts

himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him.

.     .     .     .     .

(6) Other circumstances render a dissolution equitable."

*Id.* at §§ 354(a)(3), (4) and (6).

7. Plaintiffs are not entitled to a dissolution under any of these provisions.

8. At trial, plaintiffs alleged various acts of wrongdoing on Tarantino's part. I find that Tarantino has not conducted himself in a way that tends to affect prejudicially the carrying on of the business. *Id.* at § 353(a)(3). I find that Tarantino committed no wrongful act which would require the dissolution of the partnerships in question. Nor did Tarantino willfully commit a breach of the partnership agreement or conduct himself in partnership affairs in a manner as to make it impracticable for plaintiffs to carry on the business in partnership with him. *Id.* at § 354(a)(4).

9. No other circumstances exist to make a dissolution of the partnerships in question equitable. *Id.* at § 354(a)(6).

10. Plaintiffs contended at trial that Tarantino owed them fiduciary duties under a variety of theories and breached his fiduciary duties to the Staintons.

11. Plaintiffs contended that Tarantino breached a fiduciary duty he owed to them as their attorney. I find that the Staintons did not produce a preponderance of the credible evidence to show that Tarantino acted as their attorney in the real estate transactions at issue.

12. Although an attorney-client relationship can be implied from the conduct of the parties, such conduct must evidence an offer or request by the client for legal services and an acceptance of the offer by the attorney. *Connelly v. Wolf, Block, Schorr and Solis-Cohen,* 463 F.Supp. 914, 919 (E.D.Pa.1978).

13. The Staintons and Tarantino were basically partners in a business relationship. Although Tarantino prepared some of the legal documents in the real estate transactions in question, he was performing such work for himself and for the partnership. He was not performing personal legal services in connection with these real estate deals for the Staintons, although as his partners in the transactions, they benefited from Tarantino's work.

14. Plaintiffs alleged that Tarantino owed them a fiduciary duty as their accountant and confidential advisor. An accountant is not automatically a fiduciary for his client. *See Rubin v. Katz,* 347 F.Supp. 322 (E.D.Pa.1972). Plaintiffs had the burden of proving that the accounting services and confidential financial advice that Tarantino provided them gave rise to a confidential relationship. In business relationships, a confidential relationship arises only if parties surrender substantial control over some portion of their business affairs to another. *In re Estate of Scott,* 455 Pa. 429, 432–33, 316 A.2d 883, 886 (1974).

15. Plaintiffs failed to meet their burden here. Tarantino performed accounting services for the partnerships as part of his duties as managing partner.

16. Although Mr. Stainton discussed business matters with Tarantino and the Staintons relied on Tarantino to manage the partnerships, plaintiffs did not surrender substantial control over their business affairs to Tarantino.

17. Tarantino did owe a fiduciary duty to the Staintons as their partner. *Clement v. Clement,* 436 Pa. 466, 469, 260 A.2d 728, 729 (1970). Exs. P–306, section 3.2; Ex. P–307, section 3.2.

18. Assuming, *arguendo,* that Tarantino also owed plaintiffs a fiduciary duty as their attorney, accountant and confidential financial advisor, Tarantino had the burden of showing by clear and convincing evidence that he exercised utmost good faith in his dealings with the Staintons, disclosed his role in any transactions in which he participated, and received the Staintons' consent to participate in such transactions. In addition these transac-

tions had to be fair and equitable to the plaintiffs. *Ruth v. Crane,* 392 F.Supp. 724, 729–32 (E.D.Pa.1975), *aff'd,* 564 F.2d 90 (3d Cir.1977); *Meara v. Hewitt,* 455 Pa. 132, 314 A.2d 263 (1974); *Clement v. Clement,* 436 Pa. at 468–70, 260 A.2d at 729–30; *Kribbs v. Jackson,* 387 Pa, 611, 621–22, 129 A.2d 490, 495–96 (1957); *Lynch v. Hook,* 298 Pa.Super. 27, 29–30, 444 A.2d 157, 159 (1982); *Shupp v. Brown,* 293 Pa.Super. 412, 416, 439 A.2d 178, 180 (1981).

19. Tarantino met his burden. He breached no fiduciary duty to the plaintiffs.

20. The Staintons were aware of Tarantino's role in all of the real estate transactions in question and consented to his participation in them.

21. Plaintiffs contend that Tarantino cannot meet his burden since he failed to advise them to get independent legal and accounting advice in any of the real estate transactions at issue. Certainly, the better practice would be to advise one's client to obtain independent professional advice under the circumstances of this case. However, assuming Tarantino acted as the plaintiffs' attorney or accountant in these transactions, he violated no duty by failing to do so. Pennsylvania law does not require that a lawyer or accountant advise a client to obtain independent legal or accounting advice under the circumstances of this case.

22. From my observation, Mr. Stainton appeared to be sophisticated enough in financial matters to be able to understand the essential nature of the transactions, the conflict of interest between himself and Tarantino, and the benefits each would receive from the transactions. The Staintons could clearly afford to pay for their own legal and accounting services, but for their own reasons (probably related to the fact that such services cost money) chose not to do so.

23. I also find that all of the real estate transactions in question were fair and equitable to the Staintons.

24. Plaintiffs contend that the animus between Mrs. Stainton and Tarantino pre-

vents a finding that Tarantino acted with good faith toward them. I disagree.

25. Mrs. Stainton was neither active nor interested in partnership affairs. Tarantino rightfully regarded Mr. Stainton as his true partner in the Highland Court transaction. N.T. 2–54 to 2–56; 2–68 to 2–69; 2–76 to 2–79; 2–110 to 2–114; 2–119 to 2–120; 3–167 to 3–171; 5–89 to 5–90; 5–112 to 5–115. Mrs. Stainton was not involved in the acquisition of Colonial Manor, Chestnut Hill Apartments or the Cherokee Apartments.

26. There is no credible evidence showing that Tarantino allowed his feelings about Mrs. Stainton to interfere with the management of the partnership business or to prejudice his conduct toward Mr. Stainton. Tarantino acted with utmost good faith in his dealings with the plaintiffs.

27. With respect to the amendment to the Epictetus Associates partnership agreement, Tarantino breached no fiduciary duty to the plaintiffs.

28. That agreement reflected the oral understanding between Tarantino and Mr. Stainton that the partnership interests would be re-allocated once Mr. Stainton received his original capital investment back from the refinancing of Highland Court. N.T. 3–179; 4–9; 4–13 to 4–15; 4–121 to 4–124; 12–130 to 12–132.

29. The recital of the reason for the amendment, contained in the amendment itself, comports with this version of the events. *Compare* N.T. 3–179; 4–9; 4–13 to 4–15; 4–121 to 4–124; 12–130 to 12–132 *with* Ex. P–307.

30. Tarantino did not fail to disclose the nature and effect of the amendment to Mr. Stainton. Mr. Stainton admitted at trial that he prevented Tarantino from explaining the nature and purpose of the amendment when Tarantino gave it to him. N.T. 6–12 to 6–13; 12–48. However, he and Tarantino had discussed amending the partnership on prior occasions. N.T. 4–46; 4–52 to 4–53; 4–123 to 4–124. Moreover, Mr. Stainton showed that he understood the nature and purpose of the Amendment

when he told a real estate appraiser in the summer of 1984 that he owned half of Highland Court. N.T. 11–213; 11–216 to 11–217. That was the Staintons' ownership interest as reflected in the amendment, not as in the original agreement. *Compare* Ex. P–306, section 4.1 *with* Ex. P–307, section 4.1.

31. Tarantino breached no fiduciary duty to the plaintiffs when Mr. Stainton had Mrs. Stainton assign her interest in Epictetus Associates to her husband.

32. At the time that the refinancing occurred, Tarantino and Mrs. Stainton were not getting along. N.T. 3–166 to 3–169. As Mrs. Stainton showed no interest in partnership affairs, the assignment merely made formal the true relationship between the parties and allowed the partnership to function more efficiently. N.T. 3–167 to 3–172; 3–176; 4–45.

33. Tarantino was also concerned about re-distributing the proceeds of the new mortgage loan to Mr. Stainton without some document in writing to memorialize their oral understanding. N.T. 3–171 to 3–172; 3–176; 4–57 to 4–58.

34. Tarantino realized that he would not have time to draft an amendment to the Epictetus Associates General Partnership Agreement prior to the refinancing. While he did not trust Mrs. Stainton to sign such a document *after* the proceeds of the financing were distributed, he did trust Mr. Stainton to do so. N.T. 3–171 to 3–172; 4–57 to 4–58.

35. Tarantino knew that he was at risk until Mr. Stainton signed the amendment. Mr. Stainton could have kept the proceeds of the new mortgage and disavowed the oral agreement. But Mr. Stainton signed the amendment. As Tarantino put it, "... Ed was an honorable guy. ... I gave him a chance to screw me and he didn't." N.T. 3–92.

36. Tarantino breached no fiduciary duty to the Staintons by revoking Mr. Staintons power of attorney in connection with Highland Court and giving one to Jones.

37. The purpose of giving Mr. Stainton a power of attorney was to protect his capital investment in Highland Court should something happen to Tarantino. N.T. 2–64 to 2–65; 2–84; 2–147; 2–150; 5–175.

38. Once Mr. Stainton received his capital investment back from the refinancing, the parties agreed that Mr. Stainton no longer needed to hold a power of attorney on Highland Court. N.T. 2–140; 2–147 to 2–151; 2–157; 3–163 to 3–164; 4–55.

39. Tarantino gave the power of attorney to Jones as part of his plan to provide for the continuation of the partnership business in case of his death or incapacitation. Giving a power of attorney to Jones was a stop-gap measure until the formal plan could be implemented. N.T. 4–37 to 4–38; 7–111 to 7–112; 12–162 to 12–163; 14–92 to 14–94.

40. The consideration Tarantino gave for the amendment was adequate under the circumstances. In exchange for his increased interest in Epictetus Associates, Tarantino distributed most of the proceeds of the new mortgage loan to Mr. Stainton, gave up about $35,000 of the proceeds to which he was entitled under the original Epictetus Associates partnership agreement and assumed personal liability on the new mortgage. N.T. 3–90 to 3–91; 4–57 to 4–58; 4–113 to 4–120; 12–127. I find that the transaction evidenced by the amendment was fair on its face and in substance. Plaintiffs are not entitled to the equitable remedy of rescission.

41. With respect to the Blair Hall partnership, Tarantino breached no fiduciary duty to Mr. Stainton. He did not wrongfully reduce Mr. Stainton's interest in that partnership. Mr. Stainton agreed to the reduction of his interest as part of a charitable donation to the Chestnut Hill community. N.T. 3–65 to 3–70; 3–72 to 3–76; 12–97 to 12–99; 12–119; 12–146 to 12–147; 13–26 to 13–28.

42. Nor did Tarantino misappropriate partnership funds. The bonuses he authorized in connection with the refinancing of

Colonial Manor and Chestnut Hill Apartments were reasonable under the circumstances. N.T. 5–10 to 5–18; 5–45 to 5–48; 12–123 to 12–126.

43. Tarantino did not take management fees in violation of any of the partnership agreements or Pennsylvania law.

44. I credit Tarantino on this matter. He testified that the parties orally agreed that Tarantino would receive such fees in exchange for conducting the partnership business and for syndicating the real estate transactions. N.T. 2–191; 3–17 to 3–18; 4–15 to 4–16; 12–41 to 12–45; 12–115 to 12–119. Mr. Stainton admitted being aware of this arrangement. N.T. 12–41 to 12–45. Tarantino took no management fees for managing Highland Court. N.T. 13–15. He received a rent-free apartment, an arrangement the Staintons were aware of and to which they consented. N.T. 4–167; 5–62; 5–80; 5–167; 5–176 to 5–177; 12–114 to 12–115; 13–15.

45. The fees and other compensation Tarantino received for syndicating the real estate transactions and for managing the partnerships were the ordinary and reasonable fees that a promoter and managing partner could expect to receive under the circumstances. *See* N.T. 13–174 to 13–176; 13–178 to 13–179; 14–6 to 14–7; 14–13.

46. Plaintiffs contended at trial that Tarantino committed legal malpractice. Their allegations were based on Tarantino's failure to advise the Staintons to obtain independent professional advice in the transactions in question, particularly in connection with the amendment to the Epictetus Associates partnership agreement.

47. At trial plaintiffs had the burden of proving that an attorney-client relationship existed between Tarantino and the Staintons with respect to the real estate transaction in question, a burden they did not meet. Tarantino was basically in a business relationship with the plaintiffs.

48. Assuming, *arguendo*, that Tarantino acted as their attorney in these real estate transactions, plaintiffs had the burden of proving that Tarantino failed to exercise ordinary skill, knowledge and judgment in performing legal services for the plaintiffs.

49. I find that Tarantino acted reasonably under the circumstances. He committed no acts of malpractice.

50. Assuming Tarantino acted as the Staintons' lawyer in the transactions, the better practice would have been to advise the Staintons to obtain independent legal counsel, given the conflict of interest between the parties. However, Tarantino had no legal duty to do so under these circumstances. His oversight in this regard does not rise to the level of professional malpractice.

51. Plaintiffs also asserted a claim of accounting malpractice. This claim lacks merit. Plaintiffs failed to prove either that Tarantino was their accountant in these transactions or that he was negligent. Tarantino committed no acts of accounting malpractice.

52. Plaintiffs contended at trial that Tarantino defrauded them by taking fees from managing Colonial Manor that he ought to have shared with Mr. Stainton, by reducing Mr. Stainton's interest in the Blair Hall partnership, and by reducing Mr. Stainton's interest in Epictetus Associates.

53. These allegations of fraud are based on the same set of facts on which plaintiffs ground their claims for breach of fiduciary duty.

54. As I find that Tarantino breached no fiduciary duty to the Staintons, I further find that he committed no acts of fraud against them.

55. Plaintiffs contended at trial that Jones breached a fiduciary relationship toward the Staintons by assisting Tarantino in the preparation of the amendment to the Epictetus Associates General Partnership Agreement and by failing to tell the plaintiffs or Tarantino that the Staintons should obtain independent legal counsel in the real estate transactions at issue.

56. Plaintiffs failed to prove the existence of an attorney-client relationship between Jones and themselves.

57. Jones did not perform legal services for the Staintons. Tarantino, as general and managing partner of the partnerships, employed Jones and his law firm to perform legal work for the partnerships. As partners in these partnerships, plaintiffs benefited by the legal work Jones and his law firm performed. But plaintiffs did not show the formation of an attorney-client relationship.

■ 58. Plaintiffs alleged that Jones became their fiduciary when he accepted a power of attorney, with respect to Highland Court, from Tarantino. I find that no fiduciary relationship arose from Jones' acceptance of the power of attorney, a power he never exercised.

■ 59. Assuming, *arguendo*, that Jones owed plaintiffs a fiduciary duty, Jones produced sufficient evidence to prove that he breached no duty to the plaintiffs.

60. Jones' involvement in the preparation of the amendment to the Epictetus Associates General Partnership Agreement was limited. Jones made no substantive changes in the amendment, as drafted by Tarantino. He suggested the addition of a few clauses that described the course of events leading to the amendment and explained the purpose of the amendment. N.T. 4–27 to 4–37; 4–47 to 4–51; 4–56; 7–23 to 7–24; 7–120 to 7–121; 7–125; 7–127 to 7–128; 12–158; 14–125.

61. The better practice would have been for Jones to advise Tarantino that the Staintons should have independent counsel. *See* N.T. 7–134 to 7–135. However, he had no legal duty to do so, and his failure in this regard does not rise to the level of a breach of fiduciary duty under the circumstances of this case.

62. Nor does his oversight rise to the level of professional malpractice. Jones, a busy attorney in a large law firm, considered the amendment routine. From what Tarantino told him, there was no conflict of interest between Tarantino and Mr. Stainton. *See* N.T. 7–92 to 7–99; 7–133 to 7–135; 12–157 to 12–160; 14–118 to 14–128. Jones was entitled to rely on the facts as presented to him by his client, Tarantino, the general and managing partner of Epictetus Associates. The amendment was not unfair to the Staintons on its face, and I find that Jones acted reasonably under the circumstances.

63. I find no credible evidence to support the inference that Jones or his law firm committed any wrongdoing in connection with the acquisition of Chestnut Hill Apartments or the Cherokee Apartments.

64. At trial, plaintiffs contended that Jones and Tarantino conspired to harm them. Plaintiffs had the burden of proving by clear and convincing evidence that Jones and Tarantino combined or agreed with the specific intent to commit fraud against them. *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3d Cir.1981); *Franklin Music Co. v. American Broadcast Companies*, 616 F.2d 528, 547 (3d Cir.1979).

65. Plaintiffs failed to meet their burden. There is no credible evidence to support an inference of civil conspiracy.

66. Plaintiffs alleged at trial that Tarantino violated 18 U.S.C.A. § 1962(a), (b) and (c) (West 1985), the three substantive subsections of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). As a predicate for relief under these subsections, plaintiffs had to make a prima facie showing of a pattern of racketeering activity. A pattern of racketeering activity is defined statutorily as two predicate acts of criminal conduct within a ten year period. 18 U.S.C.A. § 1961(1) and (5). *Sedima v. Imrex Co., Inc.*, —— U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

67. To make out a prima facie case under RICO, plaintiffs had to prove by a preponderance of the evidence that Tarantino committed at least two federal crimes. Plaintiffs then had to prove that those crimes together formed a "pattern" of criminal conduct. *Sedima v. Imrex Co., Inc.*, at ——, 105 S.Ct. at 3285.

■ 68. Plaintiffs failed to produce a preponderance of the evidence to show that Tarantino violated RICO. Plaintiffs failed

to show that Tarantino committed any of the alleged predicate acts, either with respect to Highland Court or any of the other real estate transactions.

69. Plaintiffs contended at trial that Tarantino breached an oral contract with Mr. Stainton to make Mr. Stainton a 50% partner in Tarantino's future real estate deals in Chestnut Hill.

70. Tarantino did not breach any oral contract with Mr. Stainton regarding the latter's participation in the Cherokee transaction. There is no credible evidence to support the allegations of fraud and racketeering with respect to the Cherokee transaction.

71. Plaintiffs contended at trial that Tarantino and Jones agreed to commit RICO violations. 18 U.S.C.A. § 1962(d).

72. Plaintiffs had the burden of proving that Tarantino and Jones agreed and specifically intended to conduct or acquire interests in the partnership through a pattern of racketeering activity. *United States v. Boffa,* 688 F.2d 919, 937 (3d Cir. 1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983).

73. Plaintiffs failed to produce a preponderance of evidence to prove that Jones and Tarantino conspired to commit violations of RICO.

74. Plaintiffs are not entitled to judicial dissolution of the partnerships under 59 Pa.Cons.Stat.Ann § 354(a)(3). Plaintiffs failed to prove that Tarantino was guilty of conduct tending to affect prejudicially the carrying on of the partnership business.

75. Nor are plaintiffs entitled to dissolution by decree of Court under 59 Pa. Cons.Stat.Ann. § 354(a)(4). Plaintiffs have failed to prove that Tarantino committed any wrongful act or breached any of the partnership agreements in question. Tarantino has not conducted himself in partnership matters so as to make it impracticable to carry on the business in partnership with him.

76. Plaintiffs have not proven sufficient facts that would render a dissolution eq-

uitable under the circumstances of this case. *Id.* at § 354(a)(6).

77. Plaintiffs contend that Tarantino has failed to provide them with financial information with regard to the partnerships since October, 1984.

78. I find no merit to this claim. Mr. Stainton never pressed Tarantino for such information once he received back his capital investments in the real estate transactions at issue. N.T. 5–16 to 5–18. Tarantino did provide Mr. Stainton with information regarding bonuses Tarantino authorized in connection with Colonial Manor and Chestnut Hill Apartments. N.T. 5–17 to 5–18.

79. In addition, Tarantino provided Mr. Stainton with information in connection with Highland Court that allowed Mr. Stainton to reap substantial income tax benefits for the 1984 and 1985 tax years. N.T. 12–104 to 12–108; Exs. T–20; T–29; T–41.

80. Under these circumstances, I find that a judicial decree of dissolution is not warranted on the grounds that Tarantino has failed to provide the plaintiffs with financial information regarding the partnerships.

81. Plaintiffs allege that the differences between Mr. Stainton and Tarantino are irreconcilable and mandate the dissolution of the partnerships.

82. Dissension between partners, without more, is insufficient grounds for judicial dissolution. *Potter v. Brown,* 328 Pa. 554, 561–62, 195 A. 901 (1938); *Aiman v. Aiman,* 61 Montg.Co.L.R. 51, 59 (1944). As the Pennsylvania Supreme Court stated in *Potter v. Brown,* "Differences and discord should be settled by the partners themselves by the application of mutual forebearance rather than by bills in equity for dissolution. Equity is not a referee of partnership quarrels. A going and prosperous business will not be dissolved merely because of friction among the partners; it will not interfere to determine which

contending faction is more at fault." 328 Pa. at 561–62, 195 A. at 904.

83. The charges of fraud, mismanagement and waste are without merit. In addition, the record clearly reflects that the plaintiffs have not actively participated in the partnership business but have left Tarantino to manage the apartment buildings in which the plaintiffs have interests.

84. Under these circumstances, I find that the animosity between the partners does not injuriously affect the partnership business. I will not dissolve this going and prosperous business because of dissension between the parties.

85. Plaintiffs never suggested at any time prior to post-trial motions that they were pressing or had any other evidence regarding their equitable claims. *Stockton v. Altman,* 432 F.2d 946, 949–50, (5th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). *See* Fed.R. Civ.P. 38(c), 39(c). Plaintiffs did not assert these equitable claims until after the jury ruled against them and the plaintiffs had agreed that I should enter judgment against them. Under these circumstances, I find, in the alternative, that plaintiffs waived their equitable claims.

86. Plaintiffs request for a judicial decree of dissolution also lacks merit because plaintiffs have failed to join parties necessary to such a decree. Ordinarily, all the partners are not only proper but are also necessary parties to an action for dissolution. 68 C.J.S. *Partnership* § 415, at 936 (1950). Plaintiffs are not partners in the Highland Partners partnership and failed to join either Epictetus Associates, the general partner of Highland Partners, or the other limited partner in that partnership.

87. In addition, plaintiffs failed to join any of the partnerships as parties to this lawsuit. *Compare Camden Securities Co. v. Lupowitz,* 500 F.Supp. 653 (E.D.Pa.1980) (under Rule 19 of the Federal Rules of Civil Procedure, the partnership was an indispensable party since it was partnership property which had allegedly been injured),

*with Winfield v. Strausberg,* 28 Pa.D. 271 (Northampton C.P.1917) (partnership need not be a party to lawsuit if all the parties interested in the lawsuit are parties).

88. Plaintiffs have not set forth sufficient facts to justify the appointment of a receiver in this case.

89. The decision whether to appoint a receiver is within the discretion of the court. *Northampton National Bank of Easton v. Piscanio,* 475 Pa. 57, 63, 379 A.2d 870, 873 (1977). Because of the drastic effect the appointment of a receiver has on a business entity (*Id.* 475 Pa. at 63, 379 A.2d at 873), a court should exercise its power to appoint a receiver "sparingly, with caution and circumspection, and only in an extreme case under extraordinary circumstances, or under such circumstances as demand or require summary relief." *Hankin v. Hankin,* 507 Pa. 603, 608, 493 A.2d 675, 677 (1985) (quoting *Tate v. Philadelphia Transportation Co.,* 410 Pa. 490, 190 A.2d 316 (1963)).

90. In cases involving an ongoing business, a court should appoint a receiver in cases of waste, dissipation, fraud or mismanagement. *Hankin v. Hankin,* 507 Pa. at 608, 493 A.2d at 679.

91. Plaintiffs' claims of waste, dissipation, fraud and mismanagement are without merit.

92. I find that greater injury will probably result from appointment of a receiver than if Tarantino continues to manage the partnerships. *Id.* 507 Pa. at 608, 493 A.2d at 677.

93. Tarantino belatedly alleges (for the first time) in his post trial submissions that Mr. Stainton dissolved Epictetus Associates in contravention of the partnership agreement by his express will to end his business relationship with Tarantino in August, 1984. *See* 59 Pa.Cons.Stat.Ann. § 353(2).

94. Based on the alleged wrongful dissolution of the partnership by Mr. Stainton, Tarantino asks this Court to allow him to buy out Mr. Stainton's interest in Epictetus Associates and continue to run the partner-

ship business. *See* 59 Pa.Cons.Stat.Ann. § 360(b)(2).

95. Tarantino has not requested equitable relief in connection with any of the other partnerships. Nor has Tarantino requested liquidation. He only requests the right to buy out Mr. Stainton.

■ 96. When no definite term or particular undertaking is specified in a partnership agreement, a partner, by his express will, can dissolve the partnership without violating the partnership agreement. 59 Pa.Cons.Stat.Ann. § 353(1)(ii). *Girard Bank v. Haley,* 460 Pa. 237, 243, 332 A.2d 443, 446 (1975).

97. Such an at-will dissolution "need not be supported by any justification." *Girard Bank v. Haley,* 460 Pa. at 243, 332 A.2d at 446.

■ 98. Where the partnership agreement *does* specify a definite term, a partner's expression of a will to dissolve is effective as a dissolution even if in contravention of the partnership agreement. 59 Pa.Cons.Stat.Ann. § 353(2); *Girard Bank v. Haley,* 460 Pa. at 243, 332 A.2d at 446.

99. The amendment to the Epictetus Associates General Partnership Agreement provides that the "term of the partnership shall commence on May 25, 1980 and shall continue in full force and effect until dissolution as is mutually agreed upon, but not later than December 30, 2020." Ex. P–307, section 1.3. Such a provision makes Epictetus Associates a partnership for a definite term for purposes of the Pennsylvania Uniform Partnership Act.

■ 100. The issue, then, is whether Mr. Stainton violated the partnership agreement when he informed Tarantino that he no longer wanted to be his partner in Highland Court.

101. Under the terms of the amendment to the Epictetus Associates General Partnership Agreement, "[n]o partner may voluntarily withdraw from the partnership without the prior written consent of the other partner, which consent shall not be unreasonably withheld." *Id.* at section 6.1.

102. The record reflects that Tarantino never gave Mr. Stainton his formal written consent to withdraw from Epictetus Associates. However, the communications between the parties indicate that Tarantino "consented" to Mr. Stainton's withdrawal from this partnership at a price Tarantino deemed fair.

103. Immediately after Mr. Stainton informed Tarantino of his desire to leave the partnership in or about July, 1984, the parties began negotiating on a price for which Mr. Stainton would be willing to part with his interest. N.T. 5–27 to 5–28; 5–30 to 5–33; 6–45 to 6–50; 6–74 to 6–78; 6–80 to 6–84.

104. I find that Tarantino "consented" to Mr. Stainton's withdrawal from Epictetus Associates if the price was right. The real issue between the parties became the price of their parting. I, therefore, find that Mr. Stainton did not violate the terms of the partnership agreement during July, August and September, 1984.

105. Negotiations continued from September, 1984, until the time suit was filed. N.T. 5–30 to 5–33. However, there is insufficient evidence to support Tarantino's claim that Stainton violated the partnership agreement with respect to this time period. Mr. Stainton did not withdraw from the partnership. *See* N.T. 6–49 to 6–50.

106. The negotiations between the parties were fruitless. The Staintons filed suit on November 15, 1984.

107. In his post-trial papers, for the first time, Tarantino belatedly claims that Mr. Stainton dissolved the partnership by filing a complaint with a request for a decree of judicial dissolution.

■ 108. In an "at-will" partnership, one in which no definite term or particular undertaking is specified in the partnership agreement, the filing of a complaint with a request for dissolution by decree of court is an expression of one partner's will to effect a dissolution of the partnership. *Cowen v. Krasas,* 51 Pa.D. & C.2d 783, 785–86 (C.P. Phila.1970). *See* Pa.Cons.Stat.Ann. § 353(1)(ii).

109. Where the partnership is for a definite term, the filing of a complaint with a request for a decree of judicial dissolution shows the requisite will to dissolve and is effective as a dissolution even if in contravention of the agreement. *Girard Bank v. Haley*, 460 Pa. at 243, 332 A.2d at 446. *Contra Aiman v. Aiman*, 61 Montg.Co. L.R. at 55; *see Potter v. Brown*, 328 Pa. 554, 562, 195 A. 901, 904 (1938) (it is not for every trival departure from duty or violation of the articles of partnership, or for every trifling fault or misconduct that courts of equity will interfere and decree a dissolution).

110. As Epictetus Associates is a partnership for a definite term, the issue on Tarantino's claim is whether Mr. Stainton dissolved the partnership by his express will in contravention of the partnership agreement when he filed this lawsuit.

111. Under the terms of the partnership agreement, Mr. Stainton could not withdraw from the partnership without Tarantino's consent, but such "consent shall not be unreasonably withheld." Ex. P–307, section 6.1. Resolution of this issue, then, depends on whether Tarantino "unreasonably withheld" his consent from Mr. Stainton to withdraw from the partnership.

112. I find that the record in this case is devoid of credible evidence to support Tarantino's claim.

113. Tarantino never made this claim in his pleadings. Nor did he prove at the trial the course of negotiations to show whether he "unreasonably withheld" his consent to Mr. Stainton's withdrawal.

114. Tarantino may assert this claim in an appropriate forum in an orderly manner.

115. Because the claim that by filing this lawsuit Mr. Stainton dissolved the partnership in violation of the partnership agreement was neither pleaded nor proven, I will not order Mr. Stainton to sell his interest in Epictetus Associates to Tarantino pursuant to 59 Pa.Cons.Stat.Ann. § 360(b)(2).

116. Assuming, *arguendo*, that Mr. Stainton dissolved the partnership in viola-

tion of the partnership agreement by filing the instant lawsuit, there is insufficient evidence from which to provide Tarantino with the relief he requests.

117. Section 360(b)(2) of the Pennsylvania Uniform Partnership Act provides as follows:

(b) Dissolution in contravention of agreement.—When dissolution is caused in contravention of the partnership agreement the rights of the partners shall be as follows:

.  .  .  .  .

(2) The partners who have not caused the dissolution wrongfully, if they all desire to continue the business in the same name, either by themselves or jointly with others, may do so, during the agreed term for the partnership, and for that purpose may possess the partnership property, if they secure the payment by bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable under paragraph (1)(ii), and in like manner indemnify him against all present or future partnership liabilities."

59 Pa.Cons.Stat.Ann. § 360(b)(2).

Thus, a court may allow an innocent partner to continue to run the partnership business if that partner (1) pays the wrongdoing partner the value of his interest in the partnership, less any damages for breach of the partnership agreement and (2) indemnifies the wrongdoer against all present or future partnership liabilities.

118. Tarantino has not pleaded or proven damages for breach of the partnership agreement.

119. The value of a partner's interest is established as of the date of dissolution in contravention of the agreement. *Id.*

120. The interest of a partner in the partnership is his share of the profits and surplus. 59 Pa.Cons.Stat.Ann. § 343.

121. Assuming, *arguendo*, that the filing of the lawsuit was a wrongful dissolu-

tion of the partnership, the relevant date is November 15, 1984.

122. Tarantino has not shown the value of Mr. Stainton's interest in Epictetus Associates as of November, 15, 1984.

123. Tarantino bases the value of Highland Court on a *February,* 1984 appraisal. N.T. 4–114, 4–126. Ex. T–43. The principal amount of the mortgage on Highland Court, the amount of security deposits owed to tenants, and a note owed on a boiler in the building all reflect a value as of *May,* 1984. N.T. 4–114; Ex. T–43.

124. Tarantino's capital contributions to Epictetus Associates are reflected as of *May,* 1984. N.T. 4–115.

125. Tarantino has not met his burden of showing the value of Stainton's interest at the material time for a compulsory buyout.

126. There is something to be said for refusing to grant relief as to matters neither pleaded nor proven to the party belatedly making the claims for the first time in post-trial submissions. After all, these are not *pro se* litigants. This factfinder, not having been shown by a preponderance of the evidence where justice lies, leaves the parties, deservedly, where he found them.

127. After the trial was over, counsel for plaintiffs sent a letter to the Court raising the newly arisen issue whether Tarantino had failed, after the end of the trial, to provide information to Mr. Stainton that was necessary to prepare the latter's current tax returns. Counsel for defendant also wrote a letter in response. Those letters are not part of the record in this case. The record must close at some point. Should plaintiffs wish to raise Tarantino's alleged failure to provide this information to the Staintons as grounds for dissolution of the partnership, they may do so in an appropriate forum in an orderly manner. Otherwise, the conclusion of a trial would simply be the beginning of an ongoing saga. A reasonable time has expired, and neither party has moved that I consider this evidence under Rule 60(b) of the Federal Rules of Civil Procedure.

128. On the record before me, the personal differences between the parties do not warrant a judicial decree of dissolution. However, such a finding does not preclude a finding in the future that it is reasonably impractical for the parties to continue to conduct the business of the partnership together. Any aggrieved party may raise such a claim in an appropriate forum, assuming that all necessary parties are joined.

129. I have carefully considered whether to grant plaintiffs' request for a further evidentiary hearing and, for the foregoing reasons and, based on the foregoing findings of fact, I find that an evidentiary hearing is unnecessary. Plaintiffs have made no showing in their motion to justify another hearing. The three weeks of trial in this matter provided sufficient opportunity for plaintiffs to present their claims to this Court.

Plaintiffs have moved for judgment notwithstanding the verdict on Counts VI, VII, XI, and XIII of their Second Amended Complaint. Plaintiffs have also moved for a new trial based on newly discovered evidence.

Plaintiffs' motions are denied for the reasons set forth below.

1. Judgment notwithstanding the verdict is an extraordinary remedy when urged by an unsuccessful plaintiff who bore the burden of proof at trial. *Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). Such a motion will be granted only if manifest injustice will result if the verdict is allowed to stand. *E.J. Stewart, Inc. v. Aitken Products, Inc.,* 607 F.Supp. 883, 888 (E.D.Pa.1985). The Court must view the evidence in a light favorable to the parties against whom the motion is made and give them the benefit of all reasonable inferences. Where there is conflicting evidence on the record, a court will assume that the jury has decided factual issues in favor of the prevailing parties.

*Fireman's Fund Insurance Co. v. Videfreeze Corp.*, 540 F.2d at 1178.

2. On the record before me, plaintiffs are not entitled to judgment notwithstanding the verdict on any of the grounds they allege.

3. In light of my findings in connection with plaintiffs' equitable claims, there is no need for further comment on plaintiffs' claim for judgment notwithstanding the verdict on Count VI. Plaintiffs are not entitled to relief on this claim.

4. Plaintiffs unsuccessfully contended at trial that Tarantino breached a fiduciary duty he owed them as their partner by failing to distribute management fees in violation of the Epictetus I partnership agreement. They now move for judgment notwithstanding the verdict on this claim.

5. In addition, plaintiffs move for judgment notwithstanding the verdict on the eleventh count of their Second Amended Complaint. That count alleges that Tarantino took partnership fees in violation of partnership agreements and Pennsylvania partnership law. Second Amended Complaint, Count XI. *See* 59 Pa.Cons.Stat.Ann. § 331(6).

6. Plaintiffs waived their right to submit this issue to the jury.

7. Plaintiffs failed to submit proposed points for charge directed to Count XI. Plaintiffs' proposed points for charge regarding the distribution of partnership fees concerned Tarantino's alleged breaches of fiduciary duty (Plaintiffs' Requested Instruction Nos. 29, 30, 31), the parol evidence rule (No. 32) and damages (No. 33). In addition, counsel for the plaintiffs failed to submit a proposed special interrogatory directed to count eleven. *See* Plaintiffs' Special Interrogatories. It is the duty of plaintiffs' counsel to see to it that each and every wholly distinct theory of liability counsel desires to have submitted to the jury is actually submitted to the jury. *Trent v. Atlantic City Electrical Co.*, 334 F.2d 847, 863 (3d Cir.1964). These oversights indicated to the Court that counsel for plaintiffs had abandoned this claim.

8. In addition, counsel for plaintiffs did not object to the Court's failure to instruct the jury on this theory of liability. Parties may not assign as error the failure to give an instruction unless they object to such failure before the jurors retire to consider their verdict. Fed.R.Civ.P. 51. *Harkins v. Ford Motor Co.*, 437 F.2d 276, 278 (3d Cir. 1970). This case does not present a situation in which there was fundamental error in a charge which was highly prejudicial and in which failure to rectify the error would result in a gross miscarriage of justice. *Harkins v. Ford Motor Co.*, 437 F.2d at 278.

9. Even if plaintiffs did not waive their claim in Count XI of their Second Amended Complaint, I find that the jury resolved this matter against the plaintiffs when they found that Tarantino breached no fiduciary duty toward the plaintiffs.

10. As plaintiffs' partner, defendant Tarantino owed a fiduciary duty to plaintiffs to act at all times in good faith in the performance of his partnership duties. *See Exs.* P–306, section 3.2; P–307, section 3.2. *Clement v. Clement*, 436 Pa. 466, 469, 260 A.2d 728, 729 (1970). *See also*, 59 Pa.Cons. Stat.Ann. § 334.

11. Plaintiffs contend that under the terms of the Epictetus I partnership agreement, Tarantino and Mr. Stainton would share equally in *income* to the partnership. Ex. P–413, Section 6.01. However, this partnership agreement is silent as to the disposition of management fees. Tarantino admitted at trial that he took virtually all of the fees from the management of Colonial Manor (N.T. 2–180 to 2–182; 2–190 to 2–191; 3–17 to 3–18), but he contended that he and Mr. Stainton orally agreed that Tarantino would receive such fees in exchange for Tarantino's managing the partnership and its property and for syndicating this real estate transaction. N.T. 2–191; 3–17 to 3–18; 4–15 to 4–16; 12–115 to 12–116. *See also* N.T. 12–41 to 12–44. Tarantino's expert on accounting testified that it is usual for the partner who manages the partnership and its property

to receive the management fees. N.T. 14–13. This expert stated that the fees Tarantino received were reasonable. N.T. 13–174 to 13–176.

12. I find that Tarantino produced sufficient evidence for the jury to conclude that he breached no duty he owed the Staintons as their partner.

13. The prevailing party is entitled to all reasonable inferences in his favor when a court considers a motion for judgment notwithstanding the verdict. The jury found that Tarantino breached no fiduciary duty to the Staintons, and it is reasonable to infer from the verdict that Tarantino did not take management fees in violation of the partnership agreement in question or in violation of Pennsylvania partnership law. Plaintiffs, thus, are not entitled to judgment notwithstanding the verdict on Count XI of their complaint.

14. Plaintiffs have also moved for judgment notwithstanding the verdict against defendant Jones. Plaintiffs allege that Jones breached a fiduciary duty he owed them as their attorney.

15. Plaintiffs assert that in representing partnerships in which they had an interest Jones thereby personally represented them.

16. On the issue whether a lawyer representing a partnership undertakes to represent each partner individually or whether he represents the partnership entity as a whole, I charged the jury, without objection, as follows:

"In determining whether a defendant's relationship with a partnership established an attorney/client relationship with the Staintons as individual partners, you may consider all the facts and circumstances, including whether the Staintons discussed partnership matters with the defendant in question. Whether they relied on the defendant, whether they communicated confidence to a defendant, and whether the defendant performed professional services for the Staintons, personally. And those are all factors that you can consider in that situation." N.T. 15–179.

17. At trial, the Staintons admitted that they had never consulted Jones on any legal matter. N.T. 5–142; 6–101. Jones also denied ever representing the Staintons. N.T. 7–4, 7–7 to 7–9.

18. In addition, Jones' expert testified that under the Code of Professional Responsibility, a lawyer who represents a partnership represents the partnership as an *entity*, not the partners *individually*. N.T. 9–11 to 9–19.

19. I find that there was sufficient evidence at trial for the jury to conclude that no attorney-client relationship existed between Jones and the Staintons so that no fiduciary relationship arose.

20. Assuming, *arguendo*, that Jones owed a fiduciary duty to the Staintons as their attorney, I find that Jones produced sufficiently clear and convincing evidence for the jury to find that he did not breach this duty. The amendment to the partnership agreement was not unfair as a matter of law. Tarantino described the transaction at length and demonstrated that the consideration he gave for his increased share of the partnership in question was approximately equal to what he received. N.T. 4–112 to 4–120. Jones' expert also testified that the transaction was not unfair on its face. N.T. 9–119 to 9–121. The jurors found that Jones breached no fiduciary duty to the plaintiffs. I will not disturb their finding.

21. Plaintiffs have also moved for judgment notwithstanding the verdict on Count XIII of their complaint, which alleged a civil conspiracy against the plaintiffs. Plaintiffs have offered no arguments in support of their motion. At trial, plaintiffs had the burden of proving by clear and convincing evidence that Jones and Tarantino agreed to perpetuate fraud on the plaintiffs and that Jones and Tarantino acted with malice against them. *Beardshall v. Minuteman Press International, Inc.*, 664 F.2d 23, 26 (3d Cir. 1981); *Franklin Music Co. v. American Broadcast Companies*, 616 F.2d 528, 547 (3d Cir. 1979); *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198,

211, 412 A.2d 466, 472–73 (1979). Jury Charge, N.T. 15–188 to 15–189. The jury found for the defendants on this claim, and I find that there was sufficient evidence on which to base their decision.

22. Plaintiffs have moved for a new trial on the basis of newly discovered evidence. This evidence consists of a statement from a trust account addressed to Tarantino at Tarantino's former place of employment. The trust is in the name of a member of the plaintiffs' family. Plaintiffs allege that this information conclusively shows that Tarantino acted as the plaintiffs' confidential financial advisor and that he owed the plaintiffs a fiduciary duty in this capacity.

23. Under Rule 60(b)(2) of the Federal Rules of Civil Procedure, parties may request relief from a judgment if they produce newly discovered evidence which could not have been uncovered by due diligence in time to move for a new trial. Fed.R.Civ.P. 60(b)(2); Fed.R.Civ.P. 59(b). In order to warrant a new trial, the evidence "must be material to the issues involved, yet not merely cumulative or impeaching and must be of such a nature that it would probably change the outcome." *Stridiron v. Stridiron,* 698 F.2d 204, 207 (3rd Cir. 1983).

24. The record shows that Tarantino drafted a trust for the Staintons' daughter in 1981, drafted a will for Mrs. Stainton, reviewed an offering memorandum for Mr. Stainton in 1979 and prepared the Staintons' tax returns. The trust statement at issue here is merely cumulative of the other evidence plaintiffs presented at trial. It does not demonstrate that the Staintons surrendered a substantial portion of their business affairs to Tarantino. *In re Estate of Scott,* 455 Pa. 429, 432–33, 316 A.2d 883, 886 (1974). Furthermore, the trust statement lists all transactions in this account from December 31, 1984 to December 31, 1985, long after Tarantino had left the employ of Peat Marwick (N.T. 1–91) and long after he could possibly have been a confidential advisor to the Staintons. This lawsuit was filed in November, 1984.

25. Even if this newly discovered evidence established that Tarantino owed the Staintons a fiduciary duty as their confidential financial advisor, I find that the outcome of the trial would not have been affected. Tarantino produced sufficient evidence for the jury to conclude that he breached no fiduciary duties to the plaintiffs.

26. Plaintiffs, therefore, are not entitled to a new trial on the basis of newly discovered evidence.

Plaintiffs have also moved for a new trial under rule 59 of the Federal Rules of Civil Procedure. For the reasons set forth below, plaintiffs' motion for a new trial is denied.

1. Rule 59 does not enumerate specific grounds for the grant of a new trial, but a new trial must be granted (1) where the verdict is against the weight of the evidence (*Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 88–89 (3d Cir. 1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)); (2) where there have been substantial errors in the admission of evidence or in the court's instructions to the jury (*Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940)); or (3) where counsel has engaged in improper conduct which had a prejudicial effect upon the jury. *Draper v. Airco, Inc.,* 580 F.2d 91, 94 (3d Cir. 1978). The authority to grant a new trial rests in the discretion of the district court. *Allied Chemical Corp. v. Daiflon,* 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam).

2. Plaintiffs have moved for a new trial on all of the above grounds.

3. Plaintiffs allege that the jury's verdict on plaintiffs' claims of breach of fiduciary duty and conspiracy went against the weight of the evidence.

4. I find that there was ample evidence to support the jury's verdict on these claims. No miscarriage of justice will occur if I allow the verdict of the jury to stand. *Lind v. Schenley Industries, Inc.,* 278 F.2d at 89.

5. Plaintiffs argue that I erred in failing to confer with counsel and to rule on proposed jury instructions prior to charging the jury. Plaintiffs claim that these alleged deficiencies resulted in their inability to make coherent, ordered and informed objections. However, plaintiffs made no request for a formal "charging" conference at trial. Nor did plaintiffs object to my ruling on the written requests for jury instructions. For this reason, plaintiffs have waived their right to object at this time. Fed.R.Civ.P. 51.

6. Even if plaintiffs did not waive their objections, I find no error in the handling of the instructions to the jury.

7. Rule 51 of the Federal Rules of Civil Procedure directs the district court to inform counsel of its proposed action upon counsel's written requests for instructions to the jury prior to the closing arguments of counsel. I did so; I covered their points. They made no objection after my charge. Plaintiffs cite no authority that requires me to hold a formal "charging" conference. Counsel were entitled to be told prior to their closing speeches as to the critical instructions which I ultimately delivered. *Williams v. Independent News Co. Inc.*, 485 F.2d 1099, 1106 (3d Cir. 1973). They were. Plaintiffs were not entitled to have instructions written out and submitted to them in advance for their editing and exceptions. *Emerick v. U.S. Suzuki Motor Corp.*, 750 F.2d 19, 22–23 (3d Cir. 1984).

8. Before opening arguments began, I informed counsel that I would be denying all points for binding instructions and covering the substance of the other points submitted. I also informed counsel that I would see them at sidebar after my instructions to the jury. N.T. 15–3.

9. Under the circumstances, I find that the plaintiffs were properly forewarned of the critical instructions in the charge and that I ruled on plaintiffs' written requests for instructions in accordance with Rule 51 of the Federal Rules of Civil Procedure.

10. Plaintiffs allege I erred in my charge by failing to include limiting instructions with respect to plaintiffs' wealth, to tax benefits received by plaintiffs and to certain parol evidence admitted in the course of trial.

11. I charged the jury concerning the limited permissible use of evidence of plaintiffs' wealth and of tax benefits as follows:

"Now, you've heard evidence concerning the plaintiffs' wealth and tax benefits, and the[ir] investment experience in other ventures. You consider this only as evidence of the plaintiffs' financial sophistication, and whether they needed to rely on the knowledge of a defendant in a particular matter, as well as for evidence of their motivation for investing in these partnerships, but—and this is a big but—the evidence of a plaintiff's wealth, of course, is not relevant to say that the plaintiffs should or shouldn't be in the right.

The rich and the poor, or the rich and the not so rich, are entitled to equal consideration. You should not let the fact [of] anyone's wealth influence your decision on the merits of their particular claims in this Court." N.T. 15–154.

12. Plaintiffs were not entitled to have the jury instructed in the precise language they proposed so long as I covered the substance of their requested instructions. *Arkwright Mutual Insurance Co. v. Philadelphia Electric Co.*, 427 F.2d 1273, 1277 (3d Cir. 1970).

13. My instruction did cover the substance of plaintiffs' requests. *Compare* N.T. 15–154 *with* Plaintiffs' Requested Instruction Nos. 5A and 5B. In my charge, I focused the attention of the jury on the permissible uses of the evidence in question. Such evidence went to the financial sophistication of the plaintiffs and their motivation for investing in the partnerships in question. There was no need to instruct the jury to compute plaintiffs' damages without an offset for tax benefits because there was no evidence of record concerning the amount of such benefits. At trial, defendants limited their questions to their expert on damages to the incentive such tax benefits would give for certain invest-

ment decisions. N.T. 14–17 to 14–21. In addition, defendants amended one of their exhibits to delete a column showing the amount of tax benefits plaintiffs received. Ex. T–45; N.T. 14–19 to 14–20. Plaintiffs made no objection to the admission of the exhibit as amended. N.T. 14–21. With no evidence of the amount of plaintiffs' tax benefits of record, I find no error in omitting reference to the effect such tax benefits had on a calculation of damages.

14. Plaintiffs also assign error to my failure to instruct the jury to consider Tarantino's testimony concerning a prior oral agreement between Tarantino and Mr. Stainton only as a defense to fraud. In addition, plaintiffs allege that it was error to admit this evidence at all.

15. Prior to trial, plaintiffs moved in limine to have evidence of the alleged oral agreement excluded as parol evidence. I allowed such evidence to be admitted as a defense to plaintiffs' allegations of fraud. Parol evidence is admissible in cases where fraud is alleged. *Keyser v. Margolis,* 422 Pa. 553, 559, 223 A.2d 13, 17 (1966).

16. At trial, plaintiffs made no objection when the evidence of the oral agreement was adduced. N.T. 3–91; 4–13 to 4–19. In fact, plaintiffs elicited on cross examination the very testimony of which they complain. Plaintiffs "opened the door" to the admission of such evidence and may not now find fault with its admission. *See Burgess v. Premier Corp.,* 727 F.2d 826, 834 (9th Cir. 1984); *United States v. Lowe,* 234 F.2d 919, 921–22 (3d Cir. 1956); J. Weinstein and M. Berger, *Weinstein's Evidence,* § 103 [02], at 103–14 (1982).

17. Alternatively, I find that no limiting instruction on parol evidence was necessary as all the parol evidence elicited concerned the allegations of fraud.

18. Under these circumstances, I find no substantial error in admitting the parol evidence in question and in failing to include a limiting instruction on the use of this evidence.

19. Plaintiffs also contend that I improperly answered a question from the jury. Shortly after they retired, the jurors submitted two questions to the Court, one of which asked whether the awarding of small or large damages in any way dissolved or altered any of the partnership contracts, or whether the contracts remained in force regardless of any award of damages. After a conference at side-bar with counsel at which no objections were preserved, I instructed the jury as follows:

THE COURT: Members of the Jury, you have submitted two questions. The first question is does the awarding of small or large damages in any way dissolve or alter any of the partnership contracts, or do the contracts remain in force regardless of any award of damages?

The answer to that question is that the manner of the dissolution or alteration of the contract is not a matter before you. And is not something that you should consider.

You do have a question that I have asked you as to whether there was breach of an oral contract for a fifty/fifty deal.

I have already explained that to you in excruciating detail. That question is before you.

N.T. 15–214 to 15–215.

20. Plaintiffs contend that this question from the jury "clearly reflected its concern that a finding of liability would result in the Staintons getting a double dip, a present award of the value of the partnerships while receiving in the future the same benefits as participants in the partnerships." Plaintiffs' Memorandum of Law in Support of Their Motion for a New Trial, at 7.

21. I find no merit in this speculation on the part of plaintiffs. Whether to dissolve or alter the partnerships in question was not an issue properly before the jury. Its job was to determine liability and damages. The jury returned with no further questions on this matter, and I find no error in my answer to the question of the jury.

22. Plaintiffs allege that I erred by admitting evidence of settlement negotiations

in violation of rule 408 of the Federal Rules of Evidence. In particular, plaintiffs assign error (1) to my admitting testimony of a real estate appraiser whom plaintiffs had retained while they were engaged in settlement discussions with Tarantino; (2) admitting a document in which Mr. Stainton offered to sell his interests in certain partnerships to Tarantino (Ex. T–22); and (3) admitting the testimony of Tarantino concerning settlement negotiations. Rule 408 of the Federal Rules of Evidence provides as follows:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rules does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408.

■ 23. The policy behind Rule 408 is to encourage the compromise and settlement of disputes. Fed.R.Evid. 408 advisory committee note. For this reason, the Rule excludes evidence obtained in the course of settlement negotiations offered to prove the validity or invalidity of a claim or its amount. However, the rules do not bar evidence offered for a purpose other than to prove or disprove liability or the amount of a claim. *See In re Japanese Electronic Products*, 723 F.2d 238, 275 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Electrical Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.,* — U.S. —, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *B & B Investment Club v. Kleinert's, Inc.,* 472 F.Supp. 787, 791 (E.D.Pa.1979).

■ 24. With respect to the testimony of the real estate appraiser, I held a side bar conference at trial. Defense counsel offered the testimony of the appraiser to show (1) that Mr. Stainton was aware at the time he spoke to the appraiser that he had a one-half interest in Highland Court, and (2) that Tarantino's offer for Mr. Stainton's partnership interest was fair. N.T. 11–202 to 11–207.

25. I ruled that Rule 408 barred the appraiser's opinion as to whether Tarantino's offer for the partnership interest was fair. N.T. 11–206. However, I allowed the appraiser to testify that Mr. Stainton had told the appraiser that he owned one-half of Highland Court. N.T. 11–206 to 11–207.

26. Mr. Stainton had earlier testified that he always thought that he had a 99% interest in Highland Court and that he was unaware of an amendment to the Epictetus General Partnership Agreement that reduced this interest to 50%.

27. The appraiser's testimony was admissible to impeach the testimony of Mr. Stainton as to the material fact of his knowledge of what interest he owned in Highland Court. *See, e.g. Estate of Spinosa v. International Harvester Co.,* 621 F.2d 1154, 1158 (1st Cir. 1980) (Rule 408 allows evidence of settlement agreements when admitted for the purposes of impeachment); *Reichenbach v. Smith,* 528 F.2d 1072, 1074–75 (5th Cir. 1976) (Rule 408 codifies a trend in case law that permits evidence of settlement for the purposes of impeachment).

■ 28. Plaintiffs also object, under Rule 408, to my admission of a document. Ex. T–22. The document in question was a letter from Mr. Stainton to Tarantino, dated September 9, 1985, in which Mr. Stainton offered to sell his interest in *three* of the partnerships in question to Mr. Tarantino. Mr. Stainton had testified moments earlier that he was interested at that time

in selling only his interests in *one* of these partnerships. N.T. 6–73 to 6–74.

29. Plaintiffs' objected to the admission of this letter under Rule 408 as evidence of settlement negotiations. At side-bar, defense counsel stated that the letter was intended to impeach Mr. Stainton's previous testimony. N.T. 6–79 to 6–80. I allowed the document to be admitted as it was being offered in good faith for another purpose under Rule 408. N.T. 6–80. The testimony was not offered to prove the validity or invalidity of a claim. It was admissible to impeach Mr. Stainton's testimony as to the material fact of how many of his partnership interests he was interested in selling at the time in question.

30. Plaintiffs' final objection under Rule 408 concerns the testimony of Tarantino in which he elaborated on notes he took after a telephone conversation with plaintiffs' counsel, John Elliott. Ex. P–1; N.T. 5–29 to 5–42. At the time of the telephone conversation in question, plaintiffs and Tarantino were discussing settlement. Plaintiffs objected to any testimony by Tarantino on the grounds that it concerned settlement negotiations.

31. Plaintiffs waived any right to object to this testimony since plaintiffs moved to admit the document in question and questioned Tarantino extensively about it. Ex. P–1; N.T. 3–89 to 3–94. Thus, plaintiffs "opened the door" to questions by Tarantino's counsel concerning the document. *Burgess v. Premier Corp.*, 727 F.2d at 834.

32. Even if plaintiffs did not waive their objection to Tarantino's testimony, the testimony in question did not offend Rule 408. First, the testimony was offered for another purpose, namely, to elaborate upon and explain Tarantino's notes of the telephone conversation for the jury. N.T. 5–29; 5–31.

33. In addition, defense counsel limited his examination of Tarantino to avoid any mention of the specific nature of the proposed settlement offer:

Q. [by Mr. Toll to Mr. Tarantino] Please, if I may, don't go into any arithmetical detail of about any discussions, et cetera; do you understand? But we will deal with other subjects, having to do with the document; do you understand?

A. [Mr. Tarantino] I think so, yes. N.T. 5–33.

34. I find that the testimony in question was offered for another purpose, under the language of Rule 408, and that none of the testimony ran afoul of that Rule. *See* N.T. 5–29 to 5–42.

35. I find no error in any of my rulings under Rule 408 of the Federal Rules of Evidence.

36. Plaintiffs final contention is that a new trial is warranted because the closing argument of Tarantino's counsel was grossly improper. Plaintiffs allege that Tarantino's references to the plaintiffs' wealth unfairly prejudiced the jury and that Tarantino's counsel made insulting references to plaintiffs and their counsel.

37. Plaintiffs waived their right to object to the closing arguments of counsel as they did not object at trial. As a rule, counsel cannot "remain silent, interpose no objections, and after a verdict has been returned seize for the first time or the point that the comments to the jury were improper and prejudicial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238–39, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940).

38. Even if plaintiffs did not waive their right to object to the closing arguments of counsel, I find that there is not a reasonable probability that the statements of counsel influenced the jury's verdict. *Draper v. Airco*, 580 F.2d 91, 97 (3d Cir. 1978).

39. Appealing to the sympathy of jurors through references to financial disparity between the parties is improper. *Id.* at 95. Plaintiffs moved in limine to exclude all evidence of plaintiffs' wealth. I limited references to the wealth of the plaintiffs to evidence of their financial sophistication.

40. Plaintiffs' theory of the case was that plaintiffs were a naive shop teacher and his wife who were hoodwinked by

two unscrupulous lawyers. Tarantino's theory of the case was that two educated, sophisticated people, with great wealth, set out to destroy him because Mrs. Stainton considered him a social climber. The closing argument of defense counsel presented Tarantino's theory of the case. The references to the wealth of the plaintiffs, including the quotation from F. Scott Fitzgerald's *Great Gatsby*, were relevant to the financial sophistication of the plaintiffs and the motivation for bringing the lawsuit.

41. Advocacy is not supposed to be devoid of passion so long as one guards against blatant appeals to bias and prejudice. *Draper v. Airco,* 580 F.2d at 95.

42. I find that the alleged improper references to plaintiffs' wealth and the alleged insulting references to plaintiffs and their counsel to be within the bounds of proper advocacy. It is not reasonably probable that this oratory of defense counsel influenced the jury's verdict.

43. Either individually, or taken as a whole, plaintiffs have not raised sufficient grounds for the grant of a new trial. The motion for a new trial is denied. It is time to end this lawsuit.